Don Springmeyer, Esq.
Nevada State Bar No. 1021
Daniel Bravo, Esq.
Nevada Bar No. 13078
**WOLF, RIFKIN, SHAPIRO,**
**SCHULMAN & RABKIN, LLP**
3556 E. Russell Road, 2nd Floor
Las Vegas, Nevada 89120-2234
Tel.: (702) 341-5200/Fax: (702) 341-5300
dspringmeyer@wrslawyers.com
dbravo@wrslawyers.com

Jason J. Thompson *(Pro hac vice to be submitted)*
Rod M. Johnston *(Pro hac vice to be submitted)*
**SOMMERS SCHWARTZ, P.C.**
One Towne Square, Suite 1700
Southfield, MI 48076
Tel.: (248) 355-0300
jthompson@sommerspc.com
rjohnston@sommerspc.com

*Counsel for Plaintiffs and Proposed Class*
*and Collective Members*

# UNITED STATES DISTRICT COURT

## DISTRICT OF NEVADA

| | |
|---|---|
| ALMEKA DODDS and LINDA ITRIC, individually, and on behalf of all others similarly situated, <br><br> Plaintiffs, <br><br> vs. <br><br> US NATIONAL PERSONAL CARE, LLC and VICTOR VARGAS, <br><br> Defendants. | **PLAINTIFFS' COLLECTIVE AND CLASS ACTION COMPLAINT** |

Plaintiffs, Almeka Dodds and Linda Itric, individually and on behalf of all others similarly situated, by and through their attorneys, hereby bring this Collective and Class Action Complaint against Defendants, US National Personal Care, LLC and Victor Vargas, and state as follows:

## **INTRODUCTION**

1.    This is a collective and class action brought pursuant to 29 U.S.C. § 216(b) and Fed. R. Civ. P. 23 by Plaintiffs, Almeka Dodds and Linda Itric ("Plaintiffs"), individually and on behalf of all similarly situated persons employed by Defendants, US National Personal Care, LLC and Victor Vargas ("Defendants"), arising from Defendants' willful violations of the Fair Labor Standards Act ("FLSA"), 29 U.S.C. § 201, *et seq.* and Nevada Revised Statutes ("N.R.S.") § 608.005, *et seq.* In connection with Defendants' unlawful conduct described herein, Plaintiffs also assert common law breach of contract claims.

2.    Plaintiffs and members of the putative FLSA collective and Rule 23 class are current and former hourly home healthcare care workers (or other job titles performing similar job duties) directly employed by Defendants.

3.    Plaintiffs and members of the putative FLSA collective and Rule 23 class regularly worked more than 40 hours per workweek and more than eight hours per workday performing a variety of personal and healthcare related services for Defendants' clients. Such services include but are not limited to: (a) hands-on assistance with activities of daily living, *e.g.*, eating, bathing, dressing, bladder and bowel requirements, and maintaining personal hygiene; (b) homemaker services and instrumental activities of daily living, *e.g.*, taking medications, shopping for groceries, laundry, housekeeping, meal preparation and service, cleaning rooms and other items, making beds, washing dishes, mopping/vacuuming floors, dusting, taking out trash, doing errands outside of the home and attending medical and other appointments; and (c) conducting mobility exercises, companionship, and supervision or cuing so that a person can perform the above-mentioned tasks themselves.

4.    Defendants failed to pay Plaintiffs and all similarly situated employees one and

one-half times their regular rates of pay for hours worked beyond 40 hours in a workweek and eight hours in a workday.

5.    Defendants committed numerous other violations of federal and state law, some of which are criminal in nature. For instance, Defendants maintained a uniform policy and practice of: (a) requiring their employees to bear the burden of state of Nevada denials of Defendants' Medicaid reimbursement claims by unlawfully withholding and/or deducting the amount of the same from employees' paychecks; (b) collecting short-term disability insurance premiums from their employees but failing to remit the same to the insurer; (c) requiring their employees' to work off the clock by refusing to compensate them for mid-shift travel time; (d) making arbitrary deductions from their employees' paychecks in amounts so small such that they are not easily observable or noticed by employees; (e) arbitrarily reducing their employees' hourly pay rates without notifying employees of the same; (f) failing to provide their employees with daily meal or rest breaks; (g) requiring their employees to work seven days per workweek without a period of rest of at least 24 consecutive hours; (h) requiring their employees to provide them with the Social Security Numbers ("SSN") of each member of the employees' household (including employees' children) while falsely informing them that such information is required for employees who work with Medicaid eligible clients, (i) terminating and withholding wages from those employees who fail to provide them with the above-mentioned SSNs; and (j) failing to withhold the requisite payroll, social security and other taxes from employees' paychecks.

## JURISDICTION AND VENUE

6.    This Court has subject matter jurisdiction over Plaintiffs' FLSA claims pursuant to 28 U.S.C. § 1331 because Plaintiffs' claims raise a federal question under 29 U.S.C. § 201, *et seq*.

7.    Additionally, this Court has jurisdiction over Plaintiffs' collective action FLSA claims pursuant to 29 U.S.C. § 216(b), which provides that suit under the FLSA "may be maintained against any employer . . . in any Federal or State court of competent jurisdiction."

8.    Defendants' annual sales exceed $500,000, and it has more than two employees;

thus, the FLSA applies in this case on an enterprise basis. Defendants' employees engage in interstate commerce; therefore, they are also covered by the FLSA on an individual basis.

9. Plaintiffs' state law claims originate from the same facts that form the basis of their federal claims. Thus, this Court has supplemental jurisdiction over Plaintiffs' state law claims pursuant to 28 U.S.C. § 1367.

10. A private party may bring an action for unpaid wages pursuant to N.R.S. § 608.005, *et seq. Neville v. Eighth Judicial Dist. Court in & for Cty. of Clark*, 406 P.3d 499, 504 (Nev. 2017) ("We conclude that the Legislature intended to create a private cause of action for unpaid wages pursuant to NRS 608.140 … The Legislature enacted NRS 608.140 to protect employees, and the legislative scheme is consistent with private causes of action for unpaid wages under NRS Chapter 608.").

11. This Court has personal jurisdiction over Defendants because they reside and conduct substantial business activities within the state of Nevada.

12. Venue is proper in this district pursuant to 28 U.S.C. § 1391(b) and (c) because Defendants employ home healthcare workers—including Plaintiffs—in this district, and a substantial portion of the events giving rise to Plaintiffs' claims occurred in this district.

## **PARTIES**

13. Plaintiff, Almeka Dodds ("Plaintiff Dodds"), is a resident of South Bend, Indiana and worked for Defendants as an hourly home healthcare worker, or Personal Care Attendant ("PCA"), from approximately April 2012 until May 2018. Plaintiff Dodds signed a consent form to join this lawsuit, which is attached as ***Exhibit 1***.

14. Plaintiff, Linda Itric ("Plaintiff Itric"), is a resident of Las Vegas, Nevada and worked for Defendants as an hourly home healthcare worker, or PCA, from approximately January 2014 until approximately February 2017. Plaintiff Itric signed a consent form to join this lawsuit, which is attached as ***Exhibit 2***.

15. Defendant, US National Personal Care, LLC ("US National"), is a Nevada Domestic Limited-Liability Company (state of Nevada Business ID (NV20081040559) and

Entity Number (E0235742008-3). US National maintains its principal place of business at 2881 South Valley View Boulevard, Suite #6, Las Vegas, Nevada 89102 and can be served via its registered agent, Victor Vargas, at the same address. US National is an In Home Supportive Care Agency that employs home healthcare workers—including Plaintiffs—to provide in-home services to Defendants' clients/patients with the goal of enabling the patient to remain at home.

16.    Defendant, Victor Vargas ("Defendant Vargas"), is a Nevada resident and is the owner and manager of US National. Defendant Vargas has complete autonomy with respect to the day-to-day management of US National and is directly responsible for—and directly involved in—implementing Defendants' illegal pay policies and practices articulated herein.

17.    At all times relevant to this Complaint, Defendants were "joint employers" of Plaintiffs and similarly situated individuals as defined by the FLSA, 29 U.S.C. § 203(d) and 29 C.F.R. § 791.2(a).

## GENERAL FACTUAL ALLEGATIONS

### THE FLSA COVERS DOMESTIC SERVICE EMPLOYEES

18.    The FLSA stands as a broad expression of Congressional policy that employers must treat workers fairly in the workplace. That includes a statutory minimum wage and mandatory overtime pay provisions, and it is backed up by a private right of action that employees can assert against employers.

19.    The FLSA's overtime provisions are at issue in this case.

20.    Covered employers—those subject to the FLSA's reach, including Defendants—must pay overtime to each employee unless the employer can show that the employee is exempt from FLSA coverage.

21.    Exemption from coverage is determined on an employee-by-employee basis, and the burden is on the employer to justify any claimed exemption.

22.    In 1974, Congress extended the FLSA's coverage to "domestic service employees." 29 U.S.C. § 202(a), 206(f), 207(l); *see* 78 Fed. Reg. 60,454, 60,457 (Oct. 1, 2013) (explaining statutory and regulatory scheme).

23.    In extending the FLSA to cover domestic service employees, however, Congress exempted "any employee employed . . . to provide companionship services for individuals who (because of age or infirmity) are unable to care for themselves." 29 U.S.C. § 213(a)(15).

24.    These employees included "'elder sitters[,],' whose primary responsibility was to watch over an elderly person . . . in the same manner that a babysitter watches over children." 78 Fed. Reg. at 60,454 (citing 110 Cong. Rec. S24773, S24801).

25.    Historically, employers like Defendants have improperly relied on the "companionship services" exemption to avoid paying overtime to home health aides such as Plaintiffs.

26.    The regulations implementing the statutory "companionship services" exemption more specifically define which employees are exempt. "Companionship services" was intended to cover "'fellowship, care, and protection,' which included 'household work . . . such as meal preparation, bed making, washing of clothes, and other similar services' and could include general household work not exceeding '20 percent of the total weekly hours worked.'" 29 C.F.R. § 552.6 (former); *see* 78 Fed. Reg. at 60,457.

27.    Accordingly, even before the new 2015 regulations came into effect, and still today, any worker who provided "companionship services" but also performed general household work in excess of 20% of total weekly output was *not* an exempt worker and thus received the benefit of the FLSA's protections.

**CONGRESS EXPANDS THE FLSA TO COVER HOME HEALTH AIDES**

28.    In October 2013, the Department of Labor ("DOL") issued a final rule ("the 2015 regulations") substantially revising the regulations implementing the FLSA's statutory exemptions. 78 Fed. Reg. 60,454 (Oct. 1, 2013). The rule states: "This regulation is effective January 1, 2015." *Id.*

29.     In the 2015 regulations, the DOL noted the changing character of today's labor force and the increasingly corporatized nature of companionship services. 78 Fed. Reg. at 60,455. The Department noted:

> As more individuals receive services at home rather than in nursing homes or other institutions, workers who provide home care services, referred to as "direct care workers" in this Final Rule but employed under titles including certified nursing assistants, home health aides, personal care aides, and caregivers, perform increasingly skilled duties. Today, direct care workers are for the most part not the elder sitters that Congress envisioned when it enacted the companionship services exemption in 1974, but are instead professional caregivers.

*Id.*

30.     The DOL also noted that "[d]espite this professionalization of home care work, many direct care workers . . . have been excluded from the minimum wage and overtime protections of the FLSA," and that the lack of such protections "harms direct care workers, who depend on wages for their livelihood," "as well as the individuals receiving services and their families, who depend on a professional, trained workforce to provide high-quality services." *Id.*

31.      Based on these findings, the 2015 regulations extended overtime and minimum wage protections to workers employed as home health aides. Specifically, employees providing medically related services to individuals are not exempt from the FLSA's protections.

32.     The 2015 regulations now state that "companionship services" as defined in the statute, 29 U.S.C. § 213(a)(15), "does not include services relating to the care and protection of the aged or infirm which require and are performed by trained personnel, such as a registered or practical nurse." 29 C.F.R. § 552.6.

33.     Thus, Section 552.6 confirms that home health aides are no longer exempt from the FLSA's coverage.

### THIRD-PARTY AGENCIES ARE SUBJECT TO SPECIAL RULES

34.     The 2015 regulations included a new provision, 29 C.F.R. § 552.109, which affected third-party employers' obligations under the FLSA.

35.     Section 552.109(a) states: "Third party employers of employees engaged in

companionship services within the meaning of § 552.6 may not avail themselves of the minimum wage and overtime exemption . . . ."

36.    Thus, as of the 2015 regulations, third-party employers—such as Defendants—could not exempt their employees from the FLSA's coverage.

**NEVADA WAGE AND HOUR LAW COVERS DOMESTIC SERVICE EMPLOYEES**

37.    The Nevada Domestic Workers' Bill of Rights law (*available at* https://www.leg.state.nv.us/Session/79th2017/Bills/SB/SB232_EN.pdf) took effect on January 1, 2018, making Nevada the eighth state to pass a law with employment protections for nannies and other domestic workers.

38.    Under the law, "domestic worker" means a natural person who is paid by an employer to perform work of a domestic nature for the employer's household, including, without limitation housekeeping, housecleaning, cooking, laundering, nanny services, or caretaking of sick, convalescing, or elderly persons. *Id*. The term includes a natural person who is employed by a third-party service or agency; and does not include a natural person who provides services on a casual, irregular, or intermittent basis. *Id*.

39.    An employer must provide to a domestic worker—when he or she begins employment—a written employment agreement outlining the conditions of employment. *Id*. If the domestic worker is not able to understand the provisions of the written agreement, the employer must ensure that those provisions are explained to the domestic worker in a language that the domestic worker understands. *Id*. The employment agreement must include (among other things) certain wage, hour, and benefits information, along with a notice of all applicable state and federal laws pertaining to the employment of domestic workers. *Id*.

40.    A domestic worker generally must, for all of his or her working time, be paid at least the minimum hourly wage published pursuant to Section 16 of Article 15 of the Nevada Constitution. *Id*. If a domestic worker is required to be on duty, he or she generally must be paid for all working time, including (without limitation) sleeping time and meal breaks. *Id*. Additionally, a domestic worker who is paid less than one and one-half times the minimum

1    hourly wage generally must be paid at least one and one-half times the domestic worker's regular

2    rate of wages for all working time in excess of eight hours in a workday or 40 hours in a week of

3    work in accordance with the provisions of N.R.S. § 608.018. *Id.*

4        41.    If a domestic worker is hired to work for 40 hours per week or more, his or her

5    employer must provide a period of rest of at least 24 consecutive hours in each calendar

6    week and at least 48 consecutive hours during each calendar month. *Id*. The domestic worker

7    may agree in writing to work on a scheduled day of rest, but must be compensated for such time

8    under the law. *Id*.

9        42.    An employer must keep a record of the wages and hours of the domestic worker

10   as required by N.R.S. § 608.115. *Id.*

11                        **DEFENDANTS' OVERTIME VIOLATIONS**

12       43.    Defendants employed Plaintiffs as home healthcare workers, or PCAs.

13       44.    At all times material hereto, Defendants failed and/or refused to pay overtime

14   premiums to Plaintiffs and those similarly situated to them for hours worked beyond 40 hours in

15   a week and eight hours in a workday. (*See, e.g.*, ***Exhibit 3*** (the "Itric Pay Stubs") *plainly* showing

16   that Plaintiff Itric routinely worked more than 80 hours during numerous two-week pay periods

17   but was paid her straight hourly rate ($11.00) for each hour worked.)

18       45.    More specifically, the Itric Pay Stubs reveal that Plaintiff Itric:

19           a.    worked 88 hours during the 08/30/2015-09/12/2015 pay period but was
20                 paid her straight hourly rate ($11.00) for all hours worked.

21           b.    worked 97 hours during the 09/13/2015-09/26/2015 pay period but was
                   paid her straight hourly rate ($11.00) for all hours worked.

22           c.    worked 97 hours during the 09/27/2015-10/10/2015 pay period but was
23                 paid her straight hourly rate ($11.00) for all hours worked.

24           d.    worked 97 hours during the 10/25/2015-11/07/2015 pay period but was
                   paid her straight hourly rate ($11.00) for all hours worked.

25           e.    worked 97 hours during the 11/08/2015-11/21/2015 pay period but was
26                 paid her straight hourly rate ($11.00) for all hours worked.

27           f.    worked 97 hours during the 11/22/2015-12/05/2015 pay period but was
                   paid her straight hourly rate ($11.00) for all hours worked.

28

g.    worked 97 hours during the 12/06/2015-12/19/2015 pay period but was paid her straight hourly rate ($11.00) for all hours worked.

h.    worked 92.30 hours during the 01/03/2016-01/16/2016 pay period but was paid her straight hourly rate ($11.00) for all hours worked.

i.    worked 107.30 hours during the 02/14/2016-02/27/2016 pay period but was paid her straight hourly rate ($11.00) for all hours worked.

j.    worked 85.30 hours during the 07/31/2016-08/13/2016 pay period but was paid her straight hourly rate ($11.00) for all hours worked.

k.    worked 93 hours during the 09/11/2016-09/24/2016 pay period but was paid her straight hourly rate ($11.00) for all hours worked.

l.    worked 94 hours during the 09/25/2016-10/08/2016 pay period but was paid her straight hourly rate ($11.00) for all hours worked.

46.    The Itric Pay Stubs—which are merely a representative sample and depict a small fraction of the hundreds of uncompensated overtime hours that she worked—cover 12 two-week pay periods (24 weeks) and show that Plaintiff Itric worked 1,141.90 hours (including 181.90 overtime hours) and was paid a straight hourly rate of $11.00 for each hour worked.

47.    181.90 hours of unpaid overtime at an overtime premium rate of $5.50 per hour constitutes $1,000.45 of unpaid overtime premiums owed to Plaintiff Itric for the overtime work she performed during the 24 weeks covered by the Itric Pay Stubs, not including any off-the-clock work she was required to perform. *See* 29 U.S.C. § 207(a)(1) ("no employer shall employ any of his employees … for a workweek longer than forty hours unless such employee receives compensation for his employment in excess of the hours above specified at a rate not less than one and one-half times the regular rate at which he is employed.").

48.    With liquidated damages, Defendants owe Plaintiff Itric, at minimum, $2,000.90 in connection with her overtime hours worked during the 12 representative pay periods described above. *See* 29 U.S.C. § 216(b) ("Any employer who [fails to pay overtime] shall be liable to the employee or employees affected in the amount of their … unpaid overtime compensation … and in an additional equal amount as liquidated damages.").

49.    Defendants subjected Plaintiff Dodds to substantially similar overtime violations. (*See, e.g.*, **Exhibit 4** (the "Dodds Pay Stubs") *plainly* showing that Plaintiff Dodds routinely

worked more than 80 hours during numerous two-week pay periods but was paid her straight hourly rate ($11.00) for each hour worked.)

50.    More specifically, the Dodds Pay Stubs reveal that Plaintiff Dodds:

a.    worked 136 hours during the 06/07/2015-06/20/2015 pay period but was paid her straight hourly rate ($11.00) for all hours worked.

b.    worked 136 hours during the 06/21/2015-07/04/2015 pay period but was paid her straight hourly rate ($11.00) for all hours worked.

c.    worked 136 hours during the 07/05/2015-07/18/2015 pay period but was paid her straight hourly rate ($11.00) for all hours worked.

d.    worked 136 hours during the 07/19/2015-08/01/2015 pay period but was paid her straight hourly rate ($11.00) for all hours worked.

e.    worked 136 hours during the 08/02/2015-08/15/2015 pay period but was paid her straight hourly rate ($11.00) for all hours worked.

f.    worked 136 hours during the 08/30/2015-09/12/2015 pay period but was paid her straight hourly rate ($11.00) for all hours worked.

g.    worked 124.15 hours during the 09/13/2015-09/26/2015 pay period but was paid her straight hourly rate ($11.00) for all hours worked.

h.    worked 112.30 hours during the 09/27/2015-10/10/2015 pay period but was paid her straight hourly rate ($11.00) for all hours worked.

i.    worked 112.30 hours during the 10/11/2015-10/24/2015 pay period but was paid her straight hourly rate ($11.00) for all hours worked.

j.    worked 110.15 hours during the 11/08/2015-11/21/2015 pay period but was paid her straight hourly rate ($11.00) for all hours worked.

k.    worked 100.30 hours during the 12/06/2015-12/19/2015 pay period but was paid her straight hourly rate ($11.00) for all hours worked.

l.    worked 119.45 hours during the 12/20/2015-01/02/2016 pay period but was paid her straight hourly rate ($11.00) for all hours worked.

m.    worked 153.30 hours during the 01/03/2016-01/16/2016 pay period but was paid her straight hourly rate ($11.00) for all hours worked.

n.    worked 93 hours during the 01/17/2016-01/30/2016 pay period but was paid her straight hourly rate ($11.00) for all hours worked.

o.    worked 133.15 hours during the 01/31/2016-02/13/2016 pay period but was paid her straight hourly rate ($11.00) for all hours worked.

p.    worked 111 hours during the 02/14/2016-02/27/2016 pay period but was paid her straight hourly rate ($11.00) for all hours worked.

q.    worked 123.15 hours during the 07/31/2016-08/13/2016 pay period but was paid her straight hourly rate ($11.00) for all hours worked.

51.    The Dodds Pay Stubs—which are merely a representative sample and depict a small fraction of the hundreds of uncompensated overtime hours that she worked—cover 17 two-week pay periods (34 weeks) and show that Plaintiff Dodds worked 2,108.25 hours (including 748.25 overtime hours) and was paid a straight hourly rate of $11.00 for each hour worked.

52.    748.25 hours of unpaid overtime at an overtime premium rate of $5.50 per hour constitutes $4,115.375 of unpaid overtime premiums owed to Plaintiff Dodds for the overtime work she performed during the 34 weeks covered by the Dodds Pay Stubs, not including any off-the-clock work she was required to perform. *See* 29 U.S.C. § 207(a)(1).

53.    With liquidated damages, Defendants owe Plaintiff Dodds, at minimum, $8,230.75 in connection with her overtime hours worked during the 17 representative pay periods described above. *See* 29 U.S.C. § 216(b).

54.    Defendants have subjected Plaintiffs and all other PCAs to substantially similar overtime violations throughout the entire class period, but have become more sophisticated with respect to concealing their illegal pay practices.

55.    For example, Defendants have recently engaged in a pattern and practice of paying PCAs half of their wages by direct deposit (with a pay stub attached to the deposit ticket) and the remainder by check (with a check stub attached thereto).

56.    The purpose of Defendants' dual payments is to divide the number of hours PCAs work across two separate pay/check stubs so that no single pay stub or check stub reflects more than 80 hours worked per two-week pay period.

57.    For example, on October 27, 2017, Defendants deposited half of Plaintiff Dodds' wages to her bank account (***Exhibit 5*** (the "October 27, 2017 Pay Stub")) and issued a check to Plaintiff Dodds for the remainder (***Exhibit 6*** (the "October 27, 2017 Check Stub")).

58.    The October 27, 2017 Pay Stub shows that Plaintiff Dodds worked 73.00 hours during the 10/08/2017-10/21/2017 pay period at a rate of $11.00 per hour and earned $803.00.

59.    The October 27, 2017 Check Stub shows that Plaintiff Dodds worked an *additional* 73.30 hours during the 10/08/2017-10/21/2017 pay period at a rate of $11.00 per hour and earned an *additional* $808.50.

60.    All told, Plaintiff Dodds worked 146.30 hours (including 66.30 overtime hours) during the 10/08/2017-10/21/2017 pay period and was paid a straight hourly rate of $11.00 per hour for each hour worked. (*See* the October 27, 2017 Pay Stub and the October 27, 2017 Check Stub.)

61.    66.30 hours of unpaid overtime at an overtime premium rate of $5.50 per hour constitutes $364.65 of unpaid overtime premiums owed to Plaintiff Dodds for the overtime work she performed during the 10/08/2017-10/21/2017 pay period, not including any off-the-clock work she was required to perform. *See* 29 U.S.C. § 207(a)(1).

62.    With liquidated damages, Defendants owe Plaintiff Dodds, at minimum, $729.30 in connection with her overtime hours worked during the 10/08/2017-10/21/2017 pay period. *See* 29 U.S.C. § 216(b).

### UNLAWFUL DEDUCTIONS

63.    In addition to Defendants' above-mentioned overtime violations, Defendants maintained a uniform policy and practice of requiring their employees to bear the burden of state of Nevada denials of Defendants' Medicaid reimbursement claims by unlawfully withholding and/or deducting the amount of the same from employees' paychecks and fraudulently informing employees that Defendants are entitled to take it from their paychecks.

64.    Defendants' employees—including Plaintiffs—perform a variety of personal and healthcare related services for Defendants' clients, many of whom are Medicaid eligible.

65.    When Defendants' employees—including Plaintiffs—provide services to Medicaid eligible patients, Defendants submit a claim to the state of Nevada seeking reimbursement for the value of the services rendered to the Medicaid recipient.

66.    Occasionally, the state of Nevada rejects Defendants' Medicaid reimbursement claims because the patient was not eligible for Medicaid services during the dates that such

services were rendered.

67.    When Defendants' Medicaid reimbursement claims are denied, Defendants deduct or withhold the amount of the denied Medicaid reimbursement claim from their employees' wages.

68.    For example, in April 2018, Defendants' Medicaid reimbursement claims were denied in connection with services rendered by Plaintiff Dodds to E.J.,[1] a patient of Defendants whom Defendants believed was eligible for Medicaid services.

69.    Defendants responded to the denied Medicaid reimbursement claim by deducting or withholding $297.50 from Plaintiff Dodds' wages during the 04/08/2018-04/21/2018 pay period.

70.    In this regard, Defendant Vargas bluntly informed Plaintiff Dodds that since the state of Nevada denied Defendants' Medicaid reimbursement claim, he was legally entitled to take it from her paycheck. In an attempt to legitimize his conduct and convince Plaintiff Dodds that he was entitled to deduct her wages, Defendant Vargas went so far as to provide documentation to Plaintiff Dodds purporting to show that Defendants' Medicaid reimbursement claim in connection with services rendered to E.J. was denied.

71.    Employers—including Defendants—cannot defeat their legal obligations under the FLSA and Nevada wage and hour law by deducting or offsetting an employee's wages with money they believe the employee owes them. Instead, the employee must be paid properly in compliance with the law first. If the employer is owed money, they cannot put that debt ahead of the employee's wages. They must instead attempt to collect after the employee has been made whole.

72.    Of course, Defendants' employees—including Plaintiff Dodds—do not validly owe *any* money to Defendants in connection with denied Medicaid reimbursement claims; and Defendants' above-described conduct constitutes, among other things, wage theft, fraud,

---

[1]    For patient privacy reasons, E.J.'s full name is being withheld from this Complaint.

1    misrepresentation and conversion.

2        73.    In addition to Defendants' unlawful deductions in connection with denied

3    Medicaid reimbursement claims, Defendants maintained a uniform policy and practice of making

4    arbitrary deductions from Defendants' paychecks in amounts so small that they were not easily

5    observable or noticed by employees.

6        74.    For example, Defendants made recurring deductions from Plaintiff Itric's

7    paychecks in amounts approximating $28 over the course of numerous separate pay periods.

8        75.    Plaintiff Itric did not notice the deductions until several months later.

9        76.    Upon noticing the deductions, Plaintiff Itric confronted Defendant Vargas and

10   demanded to know why Defendants were making unexplained, recurring deductions from her

11   paychecks. Defendant Vargas was unable to articulate a reason or purpose for the deductions.

12       77.    Plaintiff Itric further demanded that Defendants immediately cease their activities

13   in connection with these unlawful, recurring deductions.

14       78.    Defendants immediately ceased making the unlawful deductions from Plaintiff

15   Itric's paychecks. However, they failed and/or refused to reimburse Plaintiff Itric for the

16   unexplained, recurring deductions.

17                          **FAILURE TO REMIT INSURANCE PREMIUMS**

18       79.    In addition to Defendants' above-mentioned violations, Defendants maintained a

19   uniform policy and practice of collecting short-term disability insurance premiums from their

20   employees but then failing to remit the same to the insurer.

21       80.    Defendants procured a supplemental insurance policy for Plaintiff Dodds and all

22   other employees who wished to participate.

23       81.    In order to service the recurring premium payments on the supplemental

24   insurance policy, Defendants made pre-tax deductions from Plaintiff Dodds' wages. Defendants

25   were then required to remit these deductions to Aflac Inc. ("Aflac"), the provider of the

26   supplemental insurance policy.

27       82.    Defendants retained or otherwise failed to remit the withheld insurance premiums

28

1   to Aflac, thus allowing Plaintiff Dodds' supplemental insurance policy to lapse due to lack of

2   payment.

3       83.    Plaintiff Dodds was unaware that Defendants were not making the required

4   premium payments until she received an April 3, 2018 correspondence from Aflac informing her

5   that "we are no longer receiving premium payments from Us National Personal Care for your

6   coverage." The letter also informed Plaintiff Dodds that if she wanted to continue coverage, she

7   must send to Aflac the past due amount ($43.68) in addition to a monthly payment ($14.56)

8   before the May 3, 2018 Policy Termination Date.

9                          **OFF-THE-CLOCK VIOLATIONS**

10      84.    Defendants also maintained a uniform policy and practice of requiring Plaintiffs

11  and all other PCAs to work off the clock by refusing to compensate them for mid-shift travel

12  time.

13      85.    "Time spent traveling during normal working hours is considered compensable

14  work time." (*See* https://www.dol.gov/general/topic/workhours/traveltime (last visited on

15  06/15/2018)).

16      86.    "Time spent by an employee in travel as part of his principal activity, such as

17  travel from job site to job site during the workday, must be counted as hours worked." 29 C.F.R.

18  785.38.

19      87.    Under Nevada law, travel by an employee is considered to be time worked by the

20  employee if the travel is between different work sites during a workday. NV Admin. Code

21  608.130(2)(a).

22      88.    Defendants required Plaintiffs and all other PCAs to travel to the homes of

23  Defendants' clients to perform personal and healthcare related services for them.

24      89.    Defendants issued Service Plans to Plaintiffs reflecting each client that Plaintiffs

25  were required to visit, each day they were required to visit them, and the times they were

26  expected to arrive at and leave the client's home.

27      90.    Upon leaving a client's home, Plaintiffs were required to immediately travel to

28

the home of the next client on the Service Plan.

91.    Defendants violated the FLSA and Nevada wage and hour law by not paying Plaintiffs and those similarly situated to them for mid-shift travel time to and from the homes of Defendants' clients.

92.    Plaintiffs estimate that they visited four to five clients per day and that the travel time from one client location to the next was approximately 15-20 minutes.

93.    Thus, Plaintiffs spent anywhere from 45 to 80 minutes per day traveling to and from client locations (not including the time spent traveling to the first client location of the day or time spent traveling home from the last client location of the evening).

94.    Notwithstanding their obligation to compensate Plaintiffs and all other PCAs for their mid-shift travel time, Defendants maintained a uniform policy and practice of compensating Plaintiffs and PCAs *only* for time spent rendering services to Defendants' clients. Defendants do not compensate Plaintiffs and PCAs for *any* time spent traveling to and from clients' homes.

95.    Defendants do not begin compensating PCAs until *after* they arrive at the client's home and cease compensating them when they leave; thus, PCAs are required to travel to and from clients' homes off-the-clock.

96.    Defendants accomplish this policy by requiring PCAs—including Plaintiffs—to present their time cards to Defendants' clients at the time they arrive and depart from a client's home. The client records the time of arrival and departure on PCAs' time sheets, and Defendants' compensate them according to the same.

97.    At all times material hereto, Defendants were able to track the amount of time PCAs spent travelling from job site to job site. However, Defendants failed to do so and failed to compensate them for their mid-shift travel time.

98.    Thus, Plaintiffs and all other PCAs performed substantial amounts of off-the-clock work (*i.e.*, mid-shift travel time) for which they failed to receive *any* compensation. Because Plaintiffs and all other PCAs typically worked 40 hours or more in a workweek and eight hours or more in a workday, Defendants' policies and practices also deprived them of

1    overtime pay.

## MEAL AND REST BREAK VIOLATIONS

99.    In addition to the above-described violations, Defendants also failed to provide Plaintiffs and all others similarly situated with a meal period of at least one-half hour for every continuous period of eight hours worked.

100.    Nor did Defendants provide Plaintiffs and all others similarly situated with ten-minute rest breaks for every four hours or major fraction thereof worked.

101.    The nature of Plaintiffs' work—including travel time, the number of clients they were required to visit each shift, and the amount of work they were required to perform for each client—made it nearly impossible for Plaintiffs and those similarly situated to enjoy daily meal or rest periods. Thus, Plaintiffs and all other PCAs routinely worked thought their shifts without a break.

102.    In addition, Defendants routinely required Plaintiffs and all other PCAs to work seven days per workweek without a period of rest of at least 24 consecutive hours in each calendar week and at least 48 consecutive hours during each calendar month, in violation of Nevada law. *See* Nev. Rev. Stat. Ann. § SB 232, § 6 ("If a domestic worker is hired to work 40 hours per week or more, his or her employer must provide a period of rest of at least 24 consecutive hours in each calendar week and at least 48 consecutive hours during each calendar month.").

## COLLECTIVE ACTION ALLEGATIONS

103.    Plaintiffs bring this action pursuant to 29 U.S.C. § 216(b) of the FLSA on their own behalf and on behalf of:

> *All home healthcare workers who have been employed by US National Personal Care, LLC from August 15, 2015 to the present and worked more than 40 hours in one or more workweeks.*

(hereinafter referred to as the "Collective"). Plaintiffs reserve the right to amend this definition as necessary.

104.    Excluded    from    the    proposed    Collective    are    Defendants'    executives,

administrative, and professional employees, including outside sales persons.

105.    With respect to the claims set forth in this action, a collective action under the FLSA is appropriate because the employees described above are "similarly situated" to Plaintiffs under 29 U.S.C. § 216(b). The class of employees on behalf of whom Plaintiffs bring this collective action are similarly situated because: (a) they have been or are employed in the same or similar positions; (b) they were or are subject to the same or similar unlawful practices, policy, or plan; and (c) their claims are based upon the same factual and legal theories.

106.    The employment relationships between Defendants and every Collective member are the same and differ only by name and rate of pay. The key issues—whether Defendants failed to pay overtime premiums to their home healthcare workers—do not vary substantially among the Collective members.

107.    Plaintiffs estimate the Collective, including both current and former employees over the relevant period, will include several hundred members. The precise number of Collective members should be readily available from a review of Defendants' personnel and payroll records.

## NEVADA CLASS ACTION ALLEGATIONS

108.    Plaintiffs bring this action pursuant to Fed R. Civ. P. 23(b)(2) and (b)(3) on their own behalf and on behalf of:

> *All home healthcare workers who have been employed by US National Personal Care, LLC during the applicable statute of limitations who were not properly compensated under applicable Nevada law.*

(hereinafter referred to as the "Rule 23 Nevada Class"). Plaintiffs reserve the right to amend this definition if necessary.

109.    The members of the Rule 23 Nevada Class are so numerous that joinder of all Rule 23 Nevada Class members in this case would be impractical. Plaintiffs reasonably estimate that there are hundreds of Rule 23 Nevada Class members. Rule 23 Nevada Class members should be easy to identify from Defendants' computer systems and electronic payroll and personnel records.

110. There is a well-defined community of interest among Rule 23 Nevada Class members and common questions of law and fact predominate in this action over any questions affecting individual members of the Rule 23 Nevada Class. These common legal and factual questions include, but are not limited to, the following:

a. Whether the Rule 23 Nevada Class members are owed wages for time spent performing off-the-clock work activities, and if so, the appropriate amount thereof;

b. Whether the Rule 23 Nevada Class members are owed wages for time spent working overtime, and if so, the appropriate amount thereof;

c. Whether a contractual obligation existed for Defendants to pay the Rule 23 Nevada Class members for all hours worked, and if so, whether Defendants' non-payment of wages for all compensable time amounted to a breach of contract;

d. Whether Defendants failed to pay the Rule 23 Nevada Class members their wages in a timely manner, and if so, whether Defendants' failure to pay the Rule 23 Nevada Class members their wages due on time is a violation of the Class members' rights under Nevada state law;

e. Whether Defendants failed to permit the Rule 23 Nevada Class Members to take a meal period during continuous working periods of eight hours or more, and if so, whether Defendants' failure to provide for meal periods is a violation of the Rule 23 Nevada Class members' rights under Nevada law;

f. Whether Defendants unlawfully deducted or withheld wages from the Rule 23 Nevada Class members, and if so, the amount of such deductions;

g. Whether injunctive or declaratory relief is appropriate under Nevada state law; and

h. Whether Defendants willfully violated Nevada state law pursuant to the employment violations alleged herein.

111. Plaintiffs' claims are typical of those of the Rule 23 Nevada Class in that they and all other Rule 23 Nevada Class members suffered damages as a direct and proximate result of Defendants' common and systemic payroll policies and practices. Plaintiffs' claims arise from the same policies, practices, promises and course of conduct as all other Rule 23 Nevada Class members' claims, and their legal theories are based on the same legal theories as all other Rule 23 Nevada Class members.

112. Plaintiffs will fully and adequately protect the interests of the Rule 23 Nevada

Class and they have retained counsel who are qualified and experienced in the prosecution of Nevada wage and hour class actions. Neither Plaintiffs nor their counsel have interests that are contrary to, or conflicting with, the interests of the Rule 23 Nevada Class.

113.    A class action is superior to other available methods for the fair and efficient adjudication of this controversy because, *inter alia*, it is economically infeasible for Rule 23 Nevada Class members to prosecute individual actions of their own given the relatively small amount of damages at stake for each individual along with the fear of reprisal by their employer. Prosecution of this case as a Rule 23 class action will also eliminate the possibility of duplicative lawsuits being filed in state and federal courts throughout the state.

114.    This case will be manageable as a Rule 23 class action. Plaintiffs and their counsel know of no unusual difficulties in this case, and Defendants have advanced, networked computer and payroll systems that will allow the class, wage, and damages issues in this case to be resolved with relative ease.

115.    Because the elements of Rule 23(b)(3) are satisfied in this case, class certification is appropriate. *Shady Grove Orthopedic Assoc., P.A. v. Allstate Ins. Co.*, 559 U.S. 393; 130 S. Ct. 1431, 1437 (2010) ("[b]y its terms [Rule 23] creates a categorical rule entitling a plaintiff whose suit meets the specified criteria to pursue his claim as a class action").

116.    Because Defendants acted and refused to act on grounds that apply generally to the Rule 23 Nevada Class and declaratory relief is appropriate in this case with respect to the Rule 23 Nevada Class as a whole, class certification pursuant to Rule 23(b)(2) is also appropriate.

**COUNT I**
**(29 U.S.C. § 216(b) Collective Action)**
**VIOLATION OF THE FAIR LABOR STANDARDS ACT, 29 U.S.C. § 201, et seq.**
**FAILURE TO PAY OVERTIME**

117.    Plaintiffs re-allege and incorporate all previous paragraphs herein.

118.    Plaintiffs and the proposed Collective were employees covered by the FLSA and entitled to the overtime protections set forth in 29 U.S.C. § 207(a).

119.    Plaintiffs and the proposed Collective regularly worked for Defendants in excess of 40 hours per week.

120.    Defendants willfully failed to compensate Plaintiffs and the proposed Collective at one-and-one-half times their regular hourly rate for time worked in excess of 40 hours in any week.

121.    Plaintiffs and the proposed Collective are entitled to payment of overtime in an amount to be determined at trial, in accordance with 29 U.S.C. § 216(b).

122.    As a result of the underpayment of overtime compensation as alleged above, Plaintiffs and the proposed Collective are entitled to liquidated damages and litigation costs, including their reasonable attorneys' fees, in accordance with 29 U.S.C. § 216(b).

**COUNT II**
**(Rule 23 Nevada Class Action)**
**VIOLATION OF N.R.S. § 608.018**
**FAILURE TO PAY OVERTIME WAGES UNDER NEVADA LAW**

123.    Plaintiffs re-allege and incorporate all previous paragraphs herein.

124.    Defendants, Plaintiffs and the Rule 23 Nevada Class members are "employers" and "employees" for the purposes of the N.R.S.

125.    "An employer shall pay 1 1/2 times an employee's regular wage rate whenever an employee who receives compensation for employment at a rate less than 1 1/2 times the minimum rate prescribed pursuant to NRS 608.250 works: (a) More than 40 hours in any scheduled week of work; or (b) More than 8 hours in any workday unless by mutual agreement the employee works a scheduled 10 hours per day for 4 calendar days within any scheduled week of work." N.R.S. § 608.018(1).

126.    By failing to pay overtime premiums to Plaintiffs and the Rule 23 Nevada Class for all of the time they worked beyond 40 hours in a workweek and beyond eight hours in a workday, Defendants violated N.R.S. § 608.018.

127.    Defendants' actions discussed above were willfully oppressive, fraudulent and malicious, entitling Plaintiffs and the Rule 23 Nevada Class to punitive damages.

128.    On or about July 30, 2018, Plaintiffs made demand for unpaid wages upon Defendants pursuant to NRS 608.140 but satisfactory payment was not received. Despite demand, Defendants willfully refuse and continue to refuse to pay to Plaintiffs and the Rule 23 Nevada Class overtime wages that are due and owing.

129.    As a result of Defendants' above-described conduct, Plaintiffs and the Rule 23 Nevada Class have and will continue to suffer loss of income and other damages. Accordingly, Plaintiffs and the Rule 23 Nevada Class are entitled to recover unpaid wages owed, plus costs, interest, attorneys' fees, and other appropriate relief under Nevada law, including but not limited to all damages, fees and costs available under N.R.S. § 608.005, *et seq.*

**COUNT III**
**(Rule 23 Nevada Class Action)**
**VIOLATION OF N.R.S. § 608.019**
**FAILURE TO PROVIDE FOR PERIODS OF MEALS AND REST**

130.    Plaintiffs re-allege and incorporate all previous paragraphs herein.

131.    "An employer shall not employ an employee for a continuous period of 8 hours without permitting the employee to have a meal period of at least one-half hour. No period of less than 30 minutes interrupts a continuous period of work for the purposes of this subsection." N.R.S. § 608.019(1).

132.    "Every employer shall authorize and permit all his or her employees to take rest periods, which, insofar as practicable, shall be in the middle of each work period. The duration of the rest periods shall be based on the total hours worked daily at the rate of 10 minutes for each 4 hours or major fraction thereof. Rest periods need not be authorized however for employees whose total daily work time is less than 3 and one-half hours. Authorized rest periods shall be counted as hours worked, for which there shall be no deduction from wages." N.R.S. § 608.019(2).

133.    Defendants violated N.R.S. § 608.019 by failing to provide Plaintiffs and the Rule 23 Nevada Class with (a) uninterrupted, work-free, 30-minute meal periods during continuous periods of employment of eight hours or more, and (b) 10-minute rest periods for every four

hours or major fraction thereof worked.

134.    Defendants' actions discussed above were willfully oppressive, fraudulent and malicious, entitling Plaintiffs and the Rule 23 Nevada Class to punitive damages.

135.    As a result of Defendants' above-described conduct, Plaintiffs and the Rule 23 Nevada Class have and will continue to suffer loss of income and other damages. Accordingly, Plaintiffs and the Rule 23 Nevada Class are entitled to recover unpaid wages owed, plus costs, interest, attorneys' fees, and other appropriate relief under Nevada law, including but not limited to all damages, fees and costs available under N.R.S. § 608.005, *et seq*.

**COUNT IV**
**(Rule 23 Nevada Class Action)**
**VIOLATION OF N.R.S. §§ 608.100 and 608.110**
**UNLAWFUL WAGE DEDUCTIONS**

136.    Plaintiffs re-allege and incorporate all previous paragraphs herein.

137.    "It is unlawful for any employer to: (a) Pay a lower wage, salary or compensation to an employee than the amount agreed upon through a collective bargaining agreement, if any; (b) Pay a lower wage, salary or compensation to an employee than the amount that the employer is required to pay to the employee by virtue of any statute or regulation or by contract between the employer and the employee; or (c) Pay a lower wage, salary or compensation to an employee than the amount earned by the employee when the work was performed." N.R.S. § 608.100(1).

138.    "It is unlawful for any employer to require an employee to rebate, refund or return any part of the wage, salary or compensation earned by and paid to the employee." N.R.S. § 608.100(2).

139.    "It is unlawful for any employer who has the legal authority to decrease the wage, salary or compensation of an employee to implement such a decrease unless: (a) Not less than 7 days before the employee performs any work at the decreased wage, salary or compensation, the employer provides the employee with written notice of the decrease; or (b) The employer complies with the requirements relating to the decrease that are imposed on the employer pursuant to the provisions of any collective bargaining agreement or any contract between the

employer and the employee." N.R.S. § 608.100(3).

140.    "At the time of payment of wages or compensation, the employer shall furnish the employee with an itemized list showing the respective deductions made from the total amount of wages or compensation." N.R.S. § 608.110(2).

141.    As set forth, *supra*, Defendants maintained a common policy and practice of illegally withholding or deducting wages from employees' paychecks, *i.e.*, the illicit charges to Plaintiff Dodds in connection with the state of Nevada's denial of Defendants' Medicaid reimbursement claims.

142.    Defendants mandated that their employees—including Plaintiff Dodds—bear the burden of the denied Medicaid reimbursement claims. Any "agreement" Defendants may possess from any employee authorizing the deductions is void *ab initio* as a violation of Nevada law.

143.    By deducting Medicaid reimbursement denials from the wages of Plaintiffs and the Rule 23 Nevada Class, Defendants violated N.R.S. §§ 608.100 and 608.110.

144.    Defendants also maintained a common policy and practice of making arbitrary deductions from their employees' paychecks in amounts so small they are not easily observable or noticed by employees, *i.e.*, the recurring deductions from Plaintiff Itric's paychecks in amounts approximating $28 over the course of numerous separate pay periods.

145.    By making arbitrary deductions from the wages of Plaintiffs and the Rule 23 Nevada Class, Defendants violated N.R.S. §§ 608.100 and 608.110.

146.    Finally, Defendants maintained a common policy and practice of arbitrarily reducing their employees' hourly pay rates without notifying employees of the same, without giving their employees an opportunity to accept or reject the pay cut, and without securing a new contract or agreement for a reduced hourly rate. In fact, Plaintiffs and the Rule 23 Nevada Class had no idea that they were performing work under reduced pay rates until they received their paychecks on the following pay dates, reflecting that the work they performed during the prior pay period was at a reduced hourly rate.

147.    Pursuant to N.R.S. § 608.100(1), it is unlawful for any employer to pay a lower

wage, salary or compensation to an employee than the amount earned by the employee when the work was performed.

148.     Pursuant to N.R.S. § 608.100(3), it is unlawful for any employer who has the legal authority to decrease the wage, salary or compensation of an employee to implement such a decrease unless not less than 7 days before the employee performs any work at the decreased wage, salary or compensation, the employer provides the employee with written notice of the decrease.

149.     Defendants violated N.R.S. §§ 608.100 and 608.110 by (a) paying a lower wage, salary or compensation to their employees than the amounts earned by the employees when the work was performed, and (b) arbitrarily reducing their employees' hourly pay rates without prewritten notification of the same.

150.     Defendants' actions discussed above were willfully oppressive, fraudulent and malicious, entitling Plaintiffs and the Rule 23 Nevada Class to punitive damages.

151.     On or about July 30, 2018, Plaintiffs made demand for unpaid wages upon Defendants pursuant to NRS 608.140 but satisfactory payment was not received. Despite demand, Defendants willfully refuse and continue to refuse to pay to Plaintiffs and the Rule 23 Nevada Class unpaid wages that are due and owing.

152.     As a result of Defendants' above-described conduct, Plaintiffs and the Rule 23 Nevada Class have and will continue to suffer loss of income and other damages. Accordingly, Plaintiffs and the Rule 23 Nevada Class are entitled to recover unpaid wages owed, plus costs, interest, attorneys' fees, and other appropriate relief under Nevada law, including but not limited to all damages, fees and costs available under N.R.S. § 608.005, *et seq*.

**COUNT V**
**(Rule 23 Nevada Class Action)**
**VIOLATION OF N.R.S. §§ 608.020 and 608.030**
**FAILURE TO PAY WAGES UPON RESIGNATION/TERMINATION**

153.     Plaintiffs re-allege and incorporate all previous paragraphs herein.

154.     N.R.S. § 608.020 states: "Whenever an employer discharges an employee, the

wages and compensation earned and unpaid at the time of such discharge shall become due and payable immediately."

155.    N.R.S. § 608.030 states: "Whenever an employee resigns or quits his or her employment, the wages and compensation earned and unpaid at the time of the employee's resignation or quitting must be paid no later than: 1. The day on which the employee would have regularly been paid the wages or compensation; or 2. Seven days after the employee resigns or quits, whichever is earlier."

156.    "If an employer fails to pay: (a) Within 3 days after the wages or compensation of a discharged employee becomes due; or (b) On the day the wages or compensation is due to an employee who resigns or quits, the wages or compensation of the employee continues at the same rate from the day the employee resigned, quit or was discharged until paid or for 30 days, whichever is less." N.R.S. § 608.040.

157.    "Whenever an employer of labor shall discharge or lay off employees without first paying them the amount of any wages or salary then due them, in cash and lawful money of the United States, or its equivalent, or shall fail, or refuse on demand, to pay them in like money, or its equivalent, the amount of any wages or salary at the time the same becomes due and owing to them under their contract of employment, whether employed by the hour, day, week or month, each of the employees may charge and collect wages in the sum agreed upon in the contract of employment for each day the employer is in default, until the employee is paid in full, without rendering any service therefor; but the employee shall cease to draw such wages or salary 30 days after such default." N.R.S. § 608.050.

158.    "Every employee shall have a lien as provided in N.R.S. §§ 108.221 to 108.246, inclusive, and all other rights and remedies for the protection and enforcement of such salary or wages as the employee would have been entitled to had the employee rendered services therefor in the manner as last employed." N.R.S. § 608.050(2).

159.    As set forth, *supra*, Defendants regularly and repeatedly failed to pay overtime wages to Plaintiffs and the Rule 23 Nevada Class, maintained an illegal policy and practice of

1  unlawfully deducting wages from Plaintiffs and the Rule 23 Nevada Class, and failed to

2  compensate Plaintiffs and the Rule 23 Nevada Class for mid-shift travel time.

3  160.  As a result, Plaintiffs and other members of the Rule 23 Class who are no longer

4  employed by Defendants were denied prompt payment of all wages owed to them at the time of

5  their termination or resignation.

6  161.  Defendants' actions discussed above were willfully oppressive, fraudulent and

7  malicious, entitling Plaintiffs and the Rule 23 Nevada Class to punitive damages.

8  162.  On or about July 30, 2018, Plaintiffs made demand for unpaid wages upon

9  Defendants pursuant to NRS 608.140 but satisfactory payment was not received. Despite

10  demand, Defendants willfully refuse and continue to refuse to pay to Plaintiffs and the Rule 23

11  Nevada Class who are former employees all the wages that were due and owing upon the

12  termination of their employment.

13  163.  As a result of Defendants' above-described conduct, Plaintiffs and the Rule 23

14  Nevada Class have and will continue to suffer loss of income and other damages. Accordingly,

15  Plaintiffs and the Rule 23 Nevada Class are entitled to recover unpaid wages owed, plus costs,

16  interest, attorneys' fees, and other appropriate relief under Nevada law, including but not limited

17  to all damages, fees and costs available under N.R.S. § 608.005, *et seq*.

18
19  **COUNT VI**
**(Rule 23 Nevada Class Action)**
**VIOLATION OF N.R.S. § 608.158**
20  **FAILURE TO PAY PREMIUMS FOR EMPLOYEES' INSURANCE**

21  164.  Plaintiffs re-allege and incorporate all previous paragraphs herein.

22  165.  "If an employer is the policyholder of a policy of group life or health insurance

23  which covers his or her employees, the employer shall notify the employees of his or her

24  inability to pay a premium when due or of his or her intention to stop paying premiums. The

25  notice must be: (a)  Given at least 10 days before the coverage will cease; and (b) Conspicuously

26  posted at the place of employment or given in another manner which ensures that all employees

27  will receive the information." N.R.S. § 608.158(1).

28

PLAINTIFFS' COLLECTIVE AND CLASS ACTION COMPLAINT

166. "In addition to any other remedy or penalty provided in this chapter, an employer is liable to an employee for any money deducted from the employee's wages for the payment of premiums on a policy of group life or health insurance if the money was not so used." N.R.S. § 608.158(2).

167. "In addition to any other remedy or penalty provided in this chapter, if: (a) An employer knowingly and willfully stops paying premiums on a policy of group life or health insurance and fails to give proper and timely notice to his or her employees pursuant to subsection 1; and (b) One or more of the employees, after coverage under the policy ceases and before they are given notice that the employer has stopped paying premiums, incur claims for benefits which those employees would have received under the policy had their coverage not ceased, the employer is liable to those employees for the amount of the claims incurred, except that the employer's total liability for all such claims combined must not exceed the amount of the premiums, calculated on a monthly basis, that the employer would have been required to pay under the policy to provide coverage for those employees during the period in which the claims were incurred by the employees." N.R.S. § 608.158(2).

168. As set forth, *supra*, Defendants were the policyholders of a short-term group disability insurance policy covering their employees, including Plaintiff Dodds.

169. Defendants maintained an illegal policy and practice of collecting insurance premiums from Plaintiff Dodds and other employees but failing to remit such premiums to the insurer (Aflac).

170. As a result, Defendants are liable to Plaintiffs and the Rule 23 Nevada Class for any money deducted from their wages for the payment of short-term disability premiums that was not so used. N.R.S. § 608.158(2).

171. Defendants knowingly and willfully stopped paying premiums on the short-term disability insurance policy and failed to give proper and timely notice of the same to their employees pursuant to N.R.S. § 608.158(1).

172. Defendants' actions discussed above were willfully oppressive, fraudulent and

malicious, entitling Plaintiffs and the Rule 23 Nevada Class to punitive damages.

173.    As a result of Defendants' above-described conduct, Plaintiffs and the Rule 23 Nevada Class have and will continue to suffer loss of income and other damages. Accordingly, Plaintiffs and the Rule 23 Nevada Class are entitled to recover unpaid wages owed, plus costs, interest, attorneys' fees, and other appropriate relief under Nevada law, including but not limited to all damages, fees and costs available under N.R.S. § 608.005, *et seq*.

**COUNT VII**
**(Rule 23 Nevada Class Action)**
**VIOLATION OF N.R.S. § 608.016**
**FAILURE TO PAY FOR ALL HOURS WORKED**

174.    Plaintiffs re-allege and incorporate all previous paragraphs herein.

175.    N.R.S. § 608.016 provides that "an employer shall pay to the employee wages for each hour the employee works."

176.    Under Nevada law, travel by an employee is considered time worked by the employee if the travel is between different work sites during a workday. NV Admin. Code 608.130(2)(a).

177.    Defendants do not compensate Plaintiffs and the Rule 23 Nevada Class for *any* time spent traveling to and from clients' homes. As such, Defendants violated N.R.S. § 608.016.

178.    Defendants' actions discussed above were willfully oppressive, fraudulent and malicious, entitling Plaintiffs and the Rule 23 Nevada Class to punitive damages.

179.    On or about July 30, 2018, Plaintiffs made demand for unpaid wages upon Defendants pursuant to NRS 608.140 but satisfactory payment was not received. Despite demand, Defendants willfully refuse and continue to refuse to pay to Plaintiffs and the Rule 23 Nevada Class unpaid wages that are due and owing.

180.    As a result of Defendants' above-described conduct, Plaintiffs and the Rule 23 Nevada Class have and will continue to suffer loss of income and other damages. Accordingly, Plaintiffs and the Rule 23 Nevada Class are entitled to recover unpaid wages owed, plus costs, interest, attorneys' fees, and other appropriate relief under Nevada law, including but not limited

to all damages, fees and costs available under N.R.S. § 608.005, *et seq*.

**COUNT VIII**
**(Rule 23 Nevada Class Action)**
**VIOLATION OF N.R.S. § 608.115--**
**FAILURE TO MAINTAIN RECORDS OF WAGES**

181.    Plaintiffs re-allege and incorporate all previous paragraphs herein.

182.    "Every employer shall establish and maintain records of wages for the benefit of his or her employees, showing for each pay period the following information for each employee: (a) Gross wages or salary …. (b) Deductions. (c) Net cash wage or salary. (d) … total hours employed in the pay period by noting the number of hours per day. (e) Date of payment." N.R.S. § 608.115(1).

183.    "Records of wages must be maintained for a 2-year period following the entry of information in the record." N.R.S. § 608.115(3).

184.    Defendants violated N.R.S. § 608.115 by, *inter alia*, (a) failing to keep track of the time Plaintiffs and other Rule 23 Nevada Class members spent performing mid-shift off-the-clock work, and (b) failing to keep records of the deductions unlawfully withheld from the paychecks of Plaintiffs and other Rule 23 Nevada Class members.

185.    Defendants' actions discussed above were willfully oppressive, fraudulent and malicious, entitling Plaintiffs and the Rule 23 Nevada Class to punitive damages.

186.    As a result of Defendants' above-described conduct, Plaintiffs and the Rule 23 Nevada Class have and will continue to suffer loss of income and other damages. Accordingly, Plaintiffs and the Rule 23 Nevada Class are entitled to recover unpaid wages owed, plus costs, interest, attorneys' fees, and other appropriate relief under Nevada law, including but not limited to all damages, fees and costs available under N.R.S. § 608.005, *et seq*.

**COUNT IX**
**(Rule 23 Nevada Class Action)**
**BREACH OF CONTRACT**

187.    Plaintiffs re-allege and incorporate all previous paragraphs herein.

188.    At all times relevant to this action, Defendants had contracts with Plaintiffs and

every other Rule 23 Nevada Class member to pay each employee for each hour they worked at a pre-established (contractual) regularly hourly rate.

189.     Each Rule 23 Nevada Class member's contractual hourly rate is identified in paystubs and other records that Defendants prepare as part of their regular business activities.

190.     Plaintiffs and every other Rule 23 Nevada Class member accepted the terms of Defendants' contractual promises and performed under the contracts by doing their jobs and carrying out the work they performed each shift, including the unpaid off-the-clock work that was required of them, that they performed, and that was accepted by Defendants in connection with Plaintiffs' mid-shift travel time as described herein.

191.     By not paying Plaintiffs and every other Rule 23 Nevada Class member the agreed upon hourly wage for their mid-shift travel time, Defendants systematically breached their contracts with Plaintiffs and each member of the Rule 23 Nevada Class.

192.     This claim is appropriate to the extent Plaintiffs' and the Rule 23 Nevada Class members' remedies under the FLSA or Nevada law are inadequate in that Defendants paid them more than the applicable minimum wage but less than 40 hours per week (*i.e.*, pure "gap time" claims).

193.     Defendants also breached their duty of good faith and fair dealing by failing to keep track of the time Plaintiffs and other Rule 23 Nevada Class members spent performing mid-shift off-the-clock work, which is a fundamental part of an employer's job.

194.     As a direct and proximate result of Defendants' breaches of the contracts alleged herein, Plaintiffs and every other member of the Rule 23 Nevada Class have been damaged in an amount to be determined at trial.

## **RELIEF REQUESTED**

WHEREFORE, Plaintiffs, Almeka Dodds and Linda Itric, respectfully request entry of an Order:

   a.     Certifying this case as a collective action in accordance with 29 U.S.C. § 216(b) with respect to the FLSA claims set forth herein (Count I);

   b.     Certifying this action as a class action (for the Rule 23 Nevada Class) pursuant to

Rule 23(b)(2) and (b)(3) with respect to Plaintiffs' state law claims (Counts II-IX);

c. Ordering Defendants to disclose in computer format, or in print if no computer readable format is available, the names, last known addresses, dates of employment, phone numbers, and email addresses of all collective action Class members and Rule 23 Class members, and permitting Plaintiffs to send notice of this action to all those similarly situated individuals, including the publishing of notice in a manner that is reasonably calculated to apprise the class members of their rights by law to join and participate in this lawsuit;

d. Designating Plaintiffs as the representatives of the FLSA collective action Class and the Rule 23 Nevada Class, and undersigned counsel as Class counsel for the same;

e. Declaring Defendants willfully violated the FLSA and the Department of Labor's attendant regulations as cited herein;

f. Declaring Defendants violated N.R.S. §§ 608.016, 608.018, 608.019, 608.020, 608.030, 608.100, 608.110, 608.115 and 608.158 and that said violations were intentional, willfully oppressive, fraudulent and malicious;

g. Declaring that Defendants breached their contracts with Plaintiffs and each member of the Rule 23 Nevada Class in connection with Defendants' failure to compensate their employees for mid-shift travel time;

h. Granting judgment in favor of Plaintiffs and against Defendants and awarding Plaintiffs and the collective action Class and the Rule 23 Nevada Class the full amount of damages and liquidated damages available by law;

i. Awarding reasonable attorneys' fees and costs incurred by Plaintiffs in filing this action as provided by statute;

j. Awarding pre- and post-judgment interest to Plaintiffs on these damages; and

k. Awarding such other and further relief as this Court deems appropriate.

## JURY DEMAND

Plaintiffs, Almeka Dodds and Linda Itric, individually and on behalf of all others similarly situated, by and through their attorneys, hereby demand a trial by jury pursuant to Rule

/ / /

/ / /

/ / /

/ / /

/ / /

PLAINTIFFS' COLLECTIVE AND CLASS ACTION COMPLAINT

1  38 of the Federal Rules of Civil Procedure and the court rules and statutes made and provided

2  with respect to the above-entitled cause.

3

4  Dated:  August 15, 2018                    */s/ Don Springmeyer*
                                              Don Springmeyer, Esq.
5                                             Nevada State Bar No. 1021
                                              Daniel Bravo, Esq.
6                                             Nevada Bar No. 13078
                                              **WOLF, RIFKIN, SHAPIRO,**
7                                             **SCHULMAN & RABKIN, LLP**
                                              3556 E. Russell Road, Second Floor
8                                             Las Vegas, Nevada 89120

9                                             **SOMMERS SCHWARTZ, P.C.**
                                              Jason J. Thompson *(Pro hac vice to be submitted)*
10                                            Rod M. Johnston *(Pro hac vice to be submitted)*
                                              One Towne Square, Suite 1700
11                                            Southfield, MI 48076

12                                            *Counsel for Plaintiffs and Proposed Class*
                                              *And Collective Members*
13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

PLAINTIFFS' COLLECTIVE AND CLASS ACTION COMPLAINT